STATE OF MAINE                                                SUPERIOR COURT
PENOBSCOT, ss.                                               CIVIL ACTION

**EXHIBIT**

**A**

PENSC · CW-2020-147

CATHARINE GIGNAC, JACOB GIGNAC          )
and JEREMY GIGNAC,                       )
                                         )
          Plaintiffs,                    )        CLASS ACTION COMPLAINT
                                         )
     v.                                  )        JURY DEMANDED
                                         )
EASTERN MAINE HEALTHCARE                 )
SYSTEMS, d/b/a NORTHERN LIGHT            )
HEALTH, and BLACKBAUD, INC.,             )
                                         )
          Defendants.                    )


## Introduction

1.      Plaintiffs, Catharine Gignac, Jacob Gignac and Jeremy Gignac, individually and on

behalf of all others similarly situated, bring this action against Eastern Maine Healthcare Systems,

d/b/a Northern Light Health ("Northern Light") and Blackbaud, Inc. ("Blackbaud", together with

Northern Light, "Defendants") to obtain damages, restitution, and injunctive relief for the Class,

as defined below, from Defendants.  Plaintiffs make the following allegations upon information

and belief, except as to their own actions, the investigation of her counsel, and the facts that are a

matter of public record.

## Nature of the Action

2.      This class action arises out of the May of 2020, ransomware attack and data breach

("Data Breach") of Blackbaud, an entity that provides cloud solutions to not for profit companies,

including hospitals and healthcare systems like Northern Light, and in particular works with not

**FILED**

**NOV 23 2020**

PENOBSCOT JUDICIAL CENTER
NOBSCOT COUNTY SUPERIOR COURT
BANGOR DISTRICT COURT

for profits in their fundraising efforts. At the time of the Data Breach, Blackbaud hosted certain parts of the Northern Light's data base, that included confidential patient information.

3.     The healthcare information contained on those data bases that is the subject of the Data Breach is deemed private both under Maine's confidential healthcare information statute, 22 M.R.S. § 1711-C (2017)(the "Maine Confidential Healthcare Provision"), and the Healthcare Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d, et seq. As a result of the Data Breach, certain of this confidential protected healthcare information ("PHI") was stolen, and, upon information and belief, is presently subject to misuse by hackers and data thieves.

4.     The Data Breach was the result of Northern Light's recklessness and negligence in failing to encrypt PHI and to obtain adequate assurances from Blackbaud, or to determine, that Blackbaud  had adequate and sufficient computer systems and a computer protocol in place in the event of a hack and ransom of the PHI of Northern Light's patients, Plaintiffs and Class Members here.  The Data Breach is also the result of Northern Light's failure to monitor access to its confidential healthcare information that Northern Light provided to Blackbaud in order to facilitate fundraising efforts.

5.     Additionally, the Data Breach was the result of Blackbaud's failure to properly and adequately determine whether it was susceptible to a data breach, and its negligence and recklessness, in being unprepared for a ransomware attack, such that it not only suffered a breach, but capitulated to the demands of a hacker for ransom, and then failed to ensure that all confidential or private healthcare information, as those terms are defined in both the Maine Confidential Healthcare Provision and HIPAA, was returned and not duplicated. As a result of the Data Breach, Plaintiffs' confidential healthcare information or PHI, as defined under both Maine Healthcare

2

Provision and HIPAA, and that of the putative class members (the "Class", "Class Members"), as defined below,  was exposed and very likely made available to the public.

6.      Northern Light is an integrated health care system serving the state of Maine and consists of over ten hospitals and over 100 healthcare locations throughout the state.  Northern Light retained Blackbaud, one of the largest providers of not for profit cloud[1] services in the world, to maintain certain of its databases, including one that contained, among other things, the names, addresses, phone numbers, email addresses, dates of birth, gender, the Northern Light Hospital(s) and possibly the departments where Plaintiffs and each Class Member received treatment, as well as the associated dates of service. In other words, Northern Light provided Blackbaud with access to confidential and protected healthcare information or PHI as that term is defined under HIPAA and the Maine Healthcare Confidentiality Statute, from which an individual's physical, mental or behavioral condition, or medical treatment could be determined. That information was not subject to disclosure without authorization under both HIPAA (*see* 54 C.F.R. § 160.102,  HIPAA Privacy Rule and Security Rule, 45 C.F.R. and Part 164, Subparts A & E. ("Standards for Privacy of Individually Identifiable Health Information")) and the Maine Confidentiality Statute, *See* M.R.S. Title 34-B, §1207. Confidentiality of Information.

7.      Thereafter, Blackbaud maintained and secured the PHI in a reckless manner by failing to encrypt PHI while at rest, in transit and in use, failing to properly maintain its computer systems and network in a manner that would not subject it to a successful hack, and then capitulated to the demands of a hacker to pay ransom, and without being able to confirm that all of the relevant

---

[1] In the simplest terms, cloud computing means storing and accessing data and programs over the internet instead of your computer's hard drive.

information, including Plaintiffs' and Class Members' PHI was returned and not misused. Blackbaud also violated HIPAA, as a business associate of a healthcare company.

8.      Upon information and belief, the mechanism of the cyberattack and potential improper disclosure of Plaintiffs' and Class Members' PHI was a known risk to both Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the PHI from those risks left that property in a dangerous condition.

9.      Nonetheless, Defendants and their employees failed to properly monitor the computer network and systems that stored the PHI; failed to implement appropriate policies to ensure secure communications and, in Northern Light's case, to transfer the PHI to a secure vendor; and failed to properly train employees regarding ransomware attacks. Had Defendants properly monitored their networks, security, and communications and ensured that they transferred the PHI to a secure vendor, they would have discovered the cyberattack sooner or prevented it altogether. In fact, Blackbaud has announced it has "already implemented changes to prevent this specific issue from happening again."[2]  In other words, had these changes been in place previously, this incident would not have happened and Plaintiffs' and Class Members' PHI would not have been accessed.

10.     Moreover, to date, despite its own investigation, Northern Light cannot determine and has not announced definitively the extent to which Plaintiffs' and Class Members' PHI has been taken and misused. In a tacit admission that its policies with respect to entrusting third party vendors with confidential information were inadequate, Northern Light has announced that it is

---

[2] https://www.blackbaud.com/securityincident (Last Accessed August 12, 2020).

presently reviewing its internal procedures and policies regarding third party vendors such as Blackbaud, and now is presently working with Blackbaud to protect against future cyberattacks.[3]

11.     Plaintiffs' and Class Members' identities and PHI are now at risk because of Defendants' negligent, reckless and deceptive conduct as the PHI that Defendants collected and maintained is in the hands of data thieves. Defendants cannot reasonably maintain that the data thieves destroyed the subset copy simply because Blackbaud paid the ransom and the data thieves confirmed the copy was destroyed.

12.     Armed with the PHI accessed in the Data Breach, identity thieves can commit a variety of crimes including, e.g., using Plaintiffs' and Class Members' names to obtain medical services, and using Plaintiffs' and Class Members' PHI information to obtain government and insurance benefits.

13.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members, at their own cost, must now and in the future closely monitor their medical records and financial accounts to guard against identity theft and to remedy identity theft that does occur.

14.     Consequently, Plaintiffs and Class Members will also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.     Accordingly, Plaintiffs bring this class action lawsuit on behalf of themselves and those similarly situated, in order to address: (1) Northern Light's reckless, negligent and/or deceptive failure to assure that Plaintiffs' and Class Members' PHI was encrypted, to properly

---

[3] https://bangordailynews.com/2020/09/16/news/bangor/northern-light-health-patient-data-potentially-exposed-in-cyberattack/ (Last accessed on October 5, 2020).

maintain adequate internal procedures with respect to choosing and performing due diligence on third party vendors, such as Blackbaud, in order to ensure that it was entrusting Plaintiffs' and Class Members' PHI to a vendor who had the means and ability to protect it, its failure to monitor Blackbaud's access to Plaintiffs' and Class members' PHI and its deceptive statements; (2) Blackbaud's inadequate safeguarding of Class Members' PHI, which it managed, maintained, and secured; (3) Defendants' failure to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third-party; (3) Blackbaud's failure to identify all information that was accessed; and (4) Defendants failure to provide Plaintiffs and Class Members with any redress for the Data Breach.

16.     By their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals residing in Maine whose PHI was wrongfully accessed during the Data Breach.

17.     Accordingly, Plaintiffs bring this action against Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of express contract, (iii) breach of implied contract, and (iv) violations of state consumer law.

**Parties**

18.     Plaintiff Catharine Gignac is a resident and a citizen of Holden, Maine.

19.     Catharine Gignac made visits to Northern Light Eastern Maine Medical Center including in or about 2012 and provided Northern Light with her PHI. Since the Data Breach, she has taken steps to ameliorate her damages by engaging data monitoring services.

20.     Plaintiff Jacob Gignac is a resident and a citizen of Holden, Maine.

6

21. Jacob Gignac made visits to Northern Light Eastern Maine Medical Center including in 2017, and provided Northern Light with his PHI Since the Data Breach, he has taken steps to ameliorate his damages by engaging data monitoring services.

22. Plaintiff Jeremy Gignac is a resident and a citizen of Holden, Maine.

23. Jeremy Gignac made visits to Northern Light Eastern Maine Medical Center including in the Spring of 2020 and provided Northern Light with his PHI. Since the Data Breach, he has taken steps to ameliorate his damages by engaging data monitoring services.

24. Catharine Gignac, Jacob Gignac and Jeremy Gignac (collectively, the "Gignacs" or "Plaintiffs"), each provided personal confidential information to Northern Light including, among other things, physical addresses, phone numbers, email addresses, insurance information and Social Security numbers.

25. On or about September 14, 2020, each of the Plaintiffs received a letter from Northern Light in which it admitted that it had been involved in the Data Breach (the "Notification Letters") and that each of the Plaintiffs' PHI had been "impacted".

26. Specifically, the Notification Letters indicated that Northern Light used Blackbaud as a vendor providing it with cloud computing services particularly for customer relationship management and financial services. It then noted that it had received notice from Blackbaud about the "cyber incident" and described the circumstances surrounding the Data Breach.

27. The Notification Letters proceeded to explain that upon receiving notification from Blackbaud, Northern Light had undertaken its own investigation, and determined that certain of each Plaintiff's PHI had been "impacted" by the Data Breach.

28. The Notification Letter stated that such information included each Plaintiff's name, address, phone number, email address, date of birth, gender, the Northern Light Hospital or

7

hospitals where she had obtained service, and possibly the departments at which she had obtained service, and the associated dates of service. A copy of the Notification Letter (the "Notification Letter") is attached hereto as Exhibits A through C.

29.     In the Notification Letters, Northern Light did not offer to provide Plaintiffs or Class members with monitoring or any other services to protect themselves against identity theft or to determine whether their PHI was being misused. Instead, it admonished Plaintiffs themselves to "remain vigilant for attempts to obtain sensitive information from you using social engineering", admitting that Plaintiffs are at risk of identity theft and worse as a result of the Data Breach, and warning them to take steps to secure their personal confidential information.

30.     Further, it indicated that Northern Light was "working to review [its] existing policies and procedures regarding [its] third-party vendors" and was "working with Blackbaud to evaluate additional measures and safeguards to protect against this type of incident in the future." The Notification Letters also stated that Northern Light had provided the legally required notification of the incident to the United States Department of Health and Human Services.

31.     Defendant Northern Light is a not-for-profit corporation with a principal place of business in Brewer, Maine. It is an integrated healthcare system consisting of eleven hospitals, and primary and specialty care practices, as well as long terms care and home healthcare facilities, and ground and air medical transport and emergency care transportation businesses. It maintains facilities throughout the state of Maine.

32.     Defendant Blackbaud is a Delaware corporation with its principal place of business located on Daniel Island, Charleston County, South Carolina.

33.    Blackbaud manages, maintains, and provides cybersecurity for the data obtained by its clients who are, *inter alia*, schools, not for profit companies and healthcare facilities, including Northern Light.

### Jurisdiction and Venue

34.    This Court has jurisdiction over this matter as a court of general jurisdiction, as this matter arises under state statutes and common law.

35.    This Court has personal jurisdiction over Northern Light because it is resident in this jurisdiction and does business in this jurisdiction. This Court has jurisdiction over Blackbaud pursuant to 14 M.R.S.A. §704-A, as Blackbaud transacts business in this jurisdiction and has committed a tort in this jurisdiction. The actions giving rise to the claims asserted in this action arose and occurred in Maine.

36.    Venue is proper in this district pursuant to 4 M.R.S.A.§155(4) and (5) because this is the judicial district in which Northern Light and the Plaintiffs reside.

### Defendants

#### Northern Light

37.    Upon information and belief, Northern Light is a healthcare provider or facility as those terms as used under HIPAA and the Maine Confidential Healthcare Provision, respectively. According to Dun & Bradstreet, Northern Light generated $1.74 billion in revenue in 2019.[4]

38.    As a healthcare provider, Northern Light cannot disclose confidential healthcare or PHI except under limited circumstances.

---

[4]https://www.dnb.com/business-directory/company-profiles.eastern_maine_healthcare_systems.aa2cf4783d1f1c68744d7bc7dc5d9d19.html (Last accessed October 16, 2020).

39.     In this instance, and upon information and belief, Northern Light provided Blackbaud with PHI for customer relationship management and payment processing, and in order to promote Northern Light's fundraising efforts as a not for profit, which is not one of the exceptions that would have allowed Northern Light to disclose Plaintiffs' and Class Members' PHI without prior authorization. In fact, the Maine Confidential Healthcare Provision specifically prohibits the use of confidential information for the purpose of marketing or sales "without written or oral authorization for the disclosure."

40.     Although Northern Light's Notice of Privacy Practices effective March 1, 2019 ("Northern Light's Privacy Practices") indicates that it will use or share health information to inform patients about fundraising efforts, the Maine Healthcare Confidentiality Provision does not provide for such a disclosure, nor does such disclosure substitute for obtaining the written or oral authorization of the patient required under Maine law.

41.     As a cloud storage servicer, Blackbaud constitutes a business associate of Northern Light under HIPAA, and as such, has the same HIPAA requirements as Northern Light.

42.     As a business associate or vendor that had access to confidential PHI, Blackbaud was subject to and Northern Light was required to monitor Blackbaud's information systems to ensure that they complied with Northern Light's security standards.

43.     The Northern Light Health and Member Consultant, Contractor and Vendor Confidentiality Agreement (the "Confidentiality Agreement"), for instance, specifically states that, "I [the vendor] understand that my access to Northern Light Health Information systems is subject to monitoring in compliance with security standards."

44.     Moreover, the Confidentiality Agreement further provides that Northern Light reserves "the unqualified right to review every access into and activities within any Northern Light

10

information systems, as well as attempts to access any such system." The vendor, in this case Blackbaud, specifically consented to "such monitoring and information retrieval." In other words, through the Confidentiality Agreement, Northern Light undertook the duty to monitor and oversee Blackbaud's compliance with its security standards.

45.    HIPAA requires that Northern Light and Blackbaud maintain certain technical safeguards in order to protect PHI, including ensuring that patient information is encrypted such that it is unreadable and unusable if it is obtained by a third party, such as a hacker, and/or other technical safeguards.

46.    Northern Light's own Notice of Privacy Practices ("Privacy Practices"), states that: "Northern Light Health protects the privacy and confidentiality of your health information and so does the law."

47.    The Privacy Practices further states that:

"OUR DUTIES REGARDING YOUR HEALTH INFORMATION—The law requires that we:

1.  Keep your health information private and secure;
2.  Let you know promptly if a breach occurs that compromises the privacy and security of your health information;
3.  Follow the practices described in this Notice and give (or offer) you a copy of this Notice; and
4.  Not use or share your health information other than as described in this Notice unless you tell us we can in writing."

48.    While the Privacy Practices did provide that Northern Light could use health information for fundraising purposes, it said nothing about providing PHI to a vendor whose ability to maintain the confidentiality of that information was questionable, much less to a hacker seeking ransom.

49.    In fact, it stated just the opposite: that PHI would be kept private and secure, and that Northern Light patients would be promptly informed of any breach.

11

50.     Northern Light has failed Plaintiffs and Class Members by not taking sufficient steps to keep their PHI secure and by providing such PHI to Blackbaud for fundraising purposes without prior written authorization. Moreover, it provided this PHI without having performed sufficient due diligence or obtaining sufficient assurances that such information would be protected and safe, by failing to monitor Blackbaud's access to its information systems, and in particular, Blackbaud's access to Northern Light's patients' PHI, and for its failure to ensure that Blackbaud had the capacity and ability to prevent a hack and the unwarranted disclosure of such confidential healthcare information.

## Blackbaud

51.     Blackbaud represents that since originally incorporating in New York in 1982,[5] it has become "the world's leading cloud software company powering social good." This includes providing its clients with "cloud software, services, expertise, and data intelligence…" It is a publicly traded company with clients that include "nonprofits, foundations, corporations, education institutions, healthcare institutions, and the individual change agents who support them."[6]

52.     In 2019, Blackbaud reported that it had "45,000 customers located in over 100 countries," with a "total addressable market (TAM)… greater than $10 billion." [7]

53.     In the ordinary course of doing business with its clients, individuals are regularly required to provide Blackbaud's clients with sensitive, personal and private information that is

---

[5] https://investor.blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417 (Last Accessed August 12, 2020).
[6] https://www.blackbaud.com/company (Last Accessed August 12, 2020).
[7] https://investor.blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417 (Last Accessed August 12, 2020).

then stored, maintained, and secured by Blackbaud. In the case of Northern Light, this information included PHI, including:

- Names, addresses, phone numbers and email addresses;

- Dates of birth;

- Demographic information;

- Healthcare records or information;

- The places, including departments, at which medical services were performed;

- The dates on which those medical services were performed.

54.     At all relevant times, Blackbaud knew the PHI it stored was vulnerable to cyberattack. In its 2019 Annual Report, Blackbaud specifically addressed its known susceptibility to cyberattacks. Specifically, the report states,

> *If the security of our software is breached, we fail to securely collect, store and transmit customer information, or we fail to safeguard confidential donor data, we could be exposed to liability, litigation, penalties and remedial costs and our reputation and business could suffer.*
>
> Fundamental to the use of our solutions is the secure collection, storage and transmission of confidential donor and end user data and transaction data, including in our payment services. Despite the network and application security, internal control measures, and physical security procedures we employ to safeguard our systems, **we may still be vulnerable to a security breach, intrusion, loss or theft of confidential donor data and transaction data, which may harm our business, reputation and future financial results.** [Emphasis Added].
>
> Like many major businesses, we are, from time to time, a target of cyber-attacks and phishing schemes, and we expect these threats to continue. Because of the numerous and evolving cybersecurity threats, including advanced and persistent cyber-attacks, phishing and social engineering schemes, used to obtain unauthorized access, disable or degrade systems have become increasingly more complex and sophisticated **and may be difficult to detect for periods of time, we may not anticipate these acts or respond adequately or timely**... [Emphasis Added]…

Further, the existence of vulnerabilities, even if they do not result in a security breach, may harm client confidence and require substantial resources to address, and we may not be able to discover or remedy such security vulnerabilities before they are exploited, which may harm our business, reputation and future financial results. [8]

55.     Because of the highly sensitive and personal nature of the information Blackbaud maintains, manages, and secures with respect to its clients and their users, Blackbaud has acknowledged to their clients and users that this information will be comprehensively secured.

56.     Blackbaud's Privacy Policy North America ("Privacy Policy") expressly applies as follows:

At Blackbaud, we are committed to protecting your privacy. This Policy applies to Blackbaud's collection and use of personal data in connection with our marketing and provision of the Blackbaud Solutions, customer support and other services (collectively, the "Services"), for example if you are a customer, visit the website, interact with us at industry conferences, or work for a current or prospective customer of the Services.

If you're a constituent, supporter, patient or student of one of our customers, to which we provide the Services, your data will be used in accordance with that customer's privacy policy. In providing the Services, Blackbaud acts as a service provider and thus, this Policy will not apply to constituents of our customers. [9]

57.     With regard to securing the personal information of its constituents, supporters, patients or students, Blackbaud further represents:

We restrict access to personal information collected about you at our website to our employees, our affiliates' employees, those who are otherwise specified in this Policy or others who need to know that information to provide the Services to you or in the course of conducting our business operations or activities. While no website can guarantee exhaustive security, we maintain appropriate physical, electronic and procedural safeguards to protect your personal information collected via the website. We protect our databases with various physical, technical and

---

[8] https://investor.blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417 (Last Accessed August 10, 2020).

[9] https://www.blackbaud.com/company/privacy`-policy/north-america (Last Accessed August 12, 2020).

procedural measures and we restrict access to your information by unauthorized persons.

We also advise all Blackbaud employees about their responsibility to protect customer data and we provide them with appropriate guidelines for adhering to our company's business ethics standards and confidentiality policies. Inside Blackbaud, data is stored in password-controlled servers with limited access.[10]

58.     Further, due to the HIPAA, as a business associate of Northern Light, Blackbaud had additional obligations to secure patient users' information for Northern Light's healthcare clients.

59.     Both Defendants have further failed Plaintiffs and Class Members by failing to adequately secure and protect their PHI, by allowing the Private Information to be copied and potentially used or sold by criminals and identity thieves at a later date.

60.     Both Defendants further failed Plaintiffs and Class Members by failing to adequately notify them of the ransomware attack or provide any remedy other than belated and inadequate notice.

### The Cyberattack and Data Breach

61.     Prior to the ransomware attack, patients provided sensitive and identifying Private Healthcare Information to Northern Light under the premise that such information would be kept confidential and secure, and that any business associate or vendor that was employed by Northern Light, would have been sufficiently vetted such that Northern Light was assured that such confidential information would be secure, and used for the limited purpose: in this case customer

---

[10] *Id.*

relationship management, billing and payment processing and fundraising from former and current Northern Light patients.

62.     When providing such information, these individuals had the expectation that Defendants, as the managers and securers of this PHI, would maintain security against hackers and cyberattacks.

63.     Once it obtained this PHI from Northern Light, Blackbaud maintained Plaintiffs' and Class Members' PHI on a shared network, server, and/or software.  Despite its own awareness of steady increases of cyberattacks on health care, schools, and other facilities over the course of recent years, Blackbaud did not maintain adequate security of Plaintiffs' and Class Members' data to protect against hackers and cyberattacks.

64.     According to its own statements, in May of 2020, Blackbaud discovered a ransomware attack that attempted to "disrupt business by locking companies out of their own data and servers."[11]  According to Blackbaud's statements:

> After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted environment. The cybercriminal did not access credit card information, bank account information, or social security numbers. Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly… The subset of customers who were part of this incident have been notified and supplied with additional information and resources. We apologize that this happened and will continue to do our very best to supply help and support as we and our customers jointly navigate this cybercrime incident.[12]

---

[11] https://www.blackbaud.com/securityincident (Last Accessed August 12, 2020).
[12] *Id.*

16

65. Upon information and belief, the ransomware attack began in February of 2020 and continued for approximately three months until it was stopped in May of 2020.

66. As Northern Light knew or was reckless in not knowing because it had not performed sufficient due diligence, Blackbaud did not have a sufficient process or policies in place to prevent such cyberattack, which is evident by its own statements that it has " already implemented changes to prevent this specific issue from happening again."[13] It is also evident by Northern Light's statements that it is only now reviewing its existing policies and procedures with respect to its third party vendors, and that it and Blackbaud are now evaluating additional measures and safeguards to protect against this type of incident.

67. Defendants cannot reasonably rely on the word of data thieves or a "certificate of destruction" issued by those same thieves, that the copied subset of any PHI was destroyed. Had Defendants been sure that such information had been completely recovered and not copied and subject to misuse, they would not have advised the affected individuals to monitor accounts for suspicious activity. Despite recognizing the need for monitoring and heightened risk, Defendants have failed to offer Plaintiffs or Class Members any mitigation or remedy, including credit monitoring.

68. Despite having knowledge of the attack since at least May of 2020, Blackbaud did not notify its affected clients until July or August of 2020 of the compromised data, and Northern Light did not notify its patients, including Plaintiffs, for another almost 60 days.

---

[13] https://www.blackbaud.com/securityincident (Last Accessed August 12, 2020).

17

69.     Defendant has had obligations and duties created by state law, contracts, industry standards, common law, and privacy representations made to Plaintiffs and Class Members, to keep their PHI confidential and secure, and to protect it from unauthorized access and disclosure.

70.     Plaintiffs and Class Members provided their PHI to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

71.     Defendants' data security and other obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in its client's various industries preceding the date of the breach.

72.     Indeed, cyberattacks have become so notorious that as recently as November 2019, the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issued warnings to potential targets so they are aware of, and prepared for, a potential attack.[14]

73.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industries.

74.     Defendants each breached their respective obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because, in the case of Northern Light, it failed to vet Blackbaud and ensure that it had sufficient capability to keep Plaintiffs' and Class Members' PHI safe, and in the case of Blackbaud, it failed to properly maintain and safeguard its computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    In the case of Northern Light:

---

[14] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-oftargeted-ransomware (emphasis added) (Last Accessed August 12, 2020).

18

     (i)     failing to assure that Plaintiffs' and Class Members' PHI was encrypted;

     (ii)    failing to have adequate procedures in place to sufficiently vet third party vendors to whom Northern Light was entrusting confidential information and then continuing to monitor their access to PHI;

b.     In the case of Blackbaud:

     (i)     failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks; and

     (ii)    failing to properly monitor its own data security systems for existing intrusions;

c.     In the case of both Defendants:

     (i)     failing to timely notify Plaintiffs, and Class Members of the Data Breach; and

     (ii)    failing to adequately protect patients' PHI;

d.     and in other such ways yet to be discovered.

75.     As the result of Defendants' failure to take certain measures to prevent the attack until after the attack occurred, Defendants negligently and unlawfully failed to safeguard Plaintiffs and Class Members' PHI.

76.     Accordingly, as outlined below, Plaintiffs' and Class Members' daily lives were severely disrupted. Now Plaintiffs and Class Members face an increased risk of fraud and identity theft.

## Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identify Theft

77.     Cyberattacks and data breaches of medical facilities and non-profit entities are especially problematic because of the disruption they cause to the overall daily lives of patients, and donors affected by the attack.

19

78.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[15]

79.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert, reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[16]

80.     Identity thieves use stolen PHI for a variety of crimes, including insurance fraud, and identity theft. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[17]

---

[15] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 12, 2019) ("GAO Report").
[16] *See* https://www.identitytheft.gov/Steps (last visited April 12, 2019).
[17] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics1276.php (last visited August 12, 2020).





Americans' expenses/disruptions as a result of criminal activity in their name (2016)

| | |
|---|---|
| I had to request government assistance | 29.5% |
| I had to borrow money | 60.7% |
| Had to use my savings to pay for expenses | 32.8% |
| Couldn't qualify for a home loan | 32.8% |
| I lost my home/place of residence | 31.1% |
| I couldn't care for my family | 34.4% |
| Had to rely on family/friends for assistance | 49.2% |
| Lost out on an employment opportunity | 44.3% |
| Lost time away from school | 19.7% |
| Missed time away from work | 55.7% |
| Was generally inconvenienced | 73.8% |
| Other | 23% |
| None of these | 3.3% |

Source: Identity Theft Resource Center

creditcards-com

81.     Private Information is a valuable property right. [18] Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts include heavy prison sentences.  This obvious risk to reward analysis illustrates that private information, including PHI, has considerable market value.

82.     There may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when private information, PHI and/or financial information is stolen and when it is used. According to the U.S.

Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen

---

[18] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

83.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

84.     There is a strong probability that entire batches of stolen information have been either dumped on the black market and/or are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, as the Notification Letter advised, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.  *See* Exhibit A.

### Plaintiffs' and Class Members' Damages

85.     To date, Defendants have done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach including, but not limited to, the costs of credit monitoring, as well as costs and loss of time they incurred because of the Data Breach.

86.     Plaintiffs and Class Members have been damaged by the compromise of their PHI and other personal confidential information.

87.     Plaintiffs' PHI was compromised as a direct and proximate result of the Data Breach.  While the compromise of Plaintiffs' information was known as early as May of 2020, Plaintiffs did not receive a Notice until September 14, 2020. *See* e.g., Exhibit A.

88.     Like Plaintiffs, other Class Members' PHI was compromised as a direct and proximate result of the Data Breach.

22

89. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

90. Plaintiffs have incurred and Class Members will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

91. Plaintiffs and Class Members also suffered a loss of value of their PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

92. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial and medical accounts and records for misuse.

93. As many of the purchasers of PHI utilize the information only years after the breach, Plaintiffs and Class Members are forced for long periods of time to endure the fear of whether their information will be exploited by criminals and identity thieves.

94. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## Class Action Allegations

95. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

96. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons, who reside in Maine and were patients of Northern Light or one of its facilities and provided it with PHI that was improperly accessed as a result of the Data Breach.

Excluded from the Class are Defendants, their officers, directors, and employees; any entity in which either Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

97.    Numerosity.  The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, the records of approximately 675,000 persons and entities maintained by Northern Lights were compromised in the Data Breach.    The number of records that contained PHI can be determined through discovery.

98.    Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PHI;

b.    Whether Defendants, and in particular, Northern Light, failed to adequately vet and secure Plaintiffs' and Class Members' PHI when it transmitted that information to Blackbaud and thereafter failed to adequately monitor Blackbaud's access to such information;

c.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

d.    Whether Defendants' data security systems, and in particular Blackbaud's systems, prior to and during the Data Breach, complied with applicable data security laws and regulations;

e.    Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

f.    Whether Defendants owed a duty to Class Members to safeguard their PHI;

24

g.    Whether Defendant breached their duty to Class Members to safeguard their PHI;

h.    Whether computer hackers obtained, sold, copied, stored or released Class Members' PHI;

i.    Whether Northern Light knew or should have known that its vetting process for third party vendors and its monitoring services were deficient:

j.    Whether Blackbaud knew or should have known that its data security systems and monitoring processes were deficient;

k.    Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

l.    Whether Defendants' conduct was negligent or deceptive;

m.    Whether Defendants' conduct constituted a breach of an express or implied contract;

n.    Whether Defendants' conduct constituted a breach of Maine law;

o.    Whether Defendants failed to provide notice of the Data Breach in a timely manner, and

p.    Whether Plaintiffs and Class Members are entitled to damages, and/or injunctive relief.

99.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

100.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.   Plaintiffs' Counsel are competent and experienced in litigating class actions.

101.    <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs and Class Members' data was provided to Northern Light, which then transmitted this information to Blackbaud, whose systems were then breached.   The common issues arising from Defendants' conduct affecting Class Members, as

described *supra*, predominate over any individualized issues. Adjudication of the common issues in a single action has the important and desirable advantages of judicial economy.

102.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

103.    Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

**For a First Cause of Action**
**Negligence**
**(On Behalf of Plaintiffs and All Class Members Against Northern Light)**

104.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 103 above, as if fully set forth herein.

105.    Northern Light required Plaintiffs and Class Members to submit non-public personal information in order to obtain medical and other services. Northern Light had a duty to its patients, including Plaintiffs and Class Members, to securely maintain the PHI collected as promised and warranted.

26

106. By accepting the duty to maintain and secure this data in its computer systems, and sharing it and using it for commercial gain, Northern Light undertook a duty to ensure the confidentiality of Plaintiffs' and Class Members' PHI, and to take adequate precautions that any vendor with whom it shared this confidential information was prepared and capable of keeping it confidential and secure.

107. In this instance, and upon information and belief, Northern Light provided Blackbaud with PHI, in order to promote its fundraising efforts as a not for profit, which is not one of the exceptions under the Maine Healthcare Confidentiality Provision that would have allowed Northern Light to disclose Plaintiffs' and Class Members' PHI without prior written or oral authorization.

108. Moreover, under its own Confidentiality Agreement, Northern Light had the obligation to monitor Blackbaud's access to its computer systems and in particular Blackbaud's access to its patients' PHI, to ensure that Blackbaud's computer systems comported with the security standards generated by Northern Light.

109. As a cloud storage servicer, Blackbaud constitutes a business associate of Northern Light under HIPAA, and as such, has the same HIPAA requirements as Northern Light.

110. HIPAA requires that Northern Light and Blackbaud maintain certain technical safeguards in order to protect PHI, including ensuring that patient information is encrypted such that it is unreadable and unusable if it is obtained by a third party, such as a hacker, and/or other technical safeguards.

111. HIPAA also requires that Northern Light have entered into an agreement with Blackbaud that provided assurances that Blackbaud would maintain the confidentiality of the PHI to which Northern Light entrusted it, and that Northern Light take steps to perform due diligence

27